# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GUARDIAN PIPELINE, L.L.C., a Delaware
limited liability company,

    Plaintiff,

  v.          Case No.  08-C-0028

295.49 ACRES OF LAND, more or less,
in Brown Co., Calumet Co., Dodge Co.,
Fond du Lac Co., Jefferson Co., and
Outagamie Co., WI,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JERRAINE CRITER and ROSE CRITER,

    Plaintiffs,

  v.          Case No. 08-C-29

GUARDIAN PIPELINE, L.L.C.,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES FEYEN and JUDITH FEYEN,

    Plaintiffs,

  v.          Case No. 08-C-30

GUARDIAN PIPELINE, L.L.C.,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DARYL WUENNE and SUE WUENNE,

    Plaintiffs,

  v.          Case No. 08-C-54

GUARDIAN PIPELINE, L.L.C.,

Defendant.

---

## DECISION AND ORDER

---

On January 9, 2008, Plaintiff Guardian Pipeline, L.L.C. ("Guardian") commenced this in rem action, pursuant to Rule 71.1 of the Federal Rules of Civil Procedure and the Natural Gas Act (NGA), 15 U.S.C. § 717f, to acquire by eminent domain an easement for the purpose of constructing a 120-mile natural gas transmission pipeline from the Town of Ixonia in Jefferson County to the area of Green Bay, Wisconsin. Shortly thereafter, Guardian removed to this court three actions that had been commenced in three separate state courts by owners of land over which the proposed pipeline is intended to cross. In each case, the landowners asserted claims for injunctive and declaratory relief based on allegations that Guardian failed to comply with certain pre-condemnation procedures required under Wisconsin's condemnation statute. *See* Wis. Stat. ch. 32. All four cases were consolidated on January 15, 2008. Presently before the court is Guardian's motion to confirm its authority to condemn the defendant parcels of land needed for construction of its pipeline and to take immediate possession of the land for that purpose.

The in rem defendants and state court plaintiff landowners (collectively the "Landowners") oppose Guardian's motions on various grounds. As an initial matter, the state court plaintiff landowners (hereinafter the "State Plaintiffs") claim that their cases were improperly removed from state court. They have moved to remand their cases to state court and argue, along with other Landowners, that this court should abstain from exercising federal jurisdiction over their property. The Landowners also argue that Guardian is required to comply with Wisconsin's condemnation

procedure because the NGA incorporates state condemnation procedures. Others contend that the Fourteenth Amendment's guarantee of equal protection of the law or considerations of equity under the circumstances of this case mandate that state law be applied. Various Landowners argue that Guardian's motions should be denied because Guardian has failed to negotiate with them in good faith, a precondition to court ordered relief that they contend applies under both federal and state law. For these reasons, and because Guardian comes to the court with "unclean hands," the Landowners contend Guardian is not entitled to the equitable relief it seeks.

Having considered the arguments of the parties, I now conclude that the cases commenced in state court by the State Plaintiffs were properly removed and deny their motion to remand. I also conclude that the NGA does not mandate compliance with state condemnation procedures and that neither equal protection considerations nor equitable concerns prevent application of federal condemnation law. For these reasons and because Guardian has been issued a certificate of public convenience and necessity by the Federal Energy Regulatory Commission, but has been unable to agree with the Landowners on the compensation to be paid for the rights-of-way and other land needed to construct the pipeline, I conclude that Guardian's authority to condemn the property interests at issue should be confirmed. Finally, with Guardian's authority to condemn the property interests at issue confirmed, and given the deadline for completion of the pipeline, I find that the requirements for issuance of a preliminary injunction granting Guardian immediate possession of the land have been met. Guardian's motions to confirm its authority to condemn and take immediate possession of the parcels at issue will therefore be granted.

## I. Background

Guardian is a Delaware limited liability company that is in the business of constructing and

Case 1:08-cv-00028-WCG    Filed 04/11/08    Page 3 of 45    Document 171

operating interstate natural gas transmission pipelines. (Compl. ¶ 9.) Before a company like Guardian can build and operate a new pipeline, it must obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission ("FERC"). The procedure for obtaining a certificate from FERC is set forth in the NGA, 15 U.S.C. § 717 *et seq.*, and its implementing regulations, 18 C.F.R. § 157.1 *et seq.* In order to issue a certificate, FERC must determine that the pipeline "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). As part of its evaluation, FERC must also investigate the environmental consequences of the proposed project and issue an environmental impact statement. *See* 42 U.S.C. § 4332. Once FERC issues a certificate, the NGA empowers the certificate holder to exercise "the right of eminent domain" over any lands needed for the project. 15 U.S.C. § 717f(h).

On December 14, 2007, FERC issued a certificate of public convenience and necessity granting Guardian authority to construct a natural gas transmission pipeline extending 119.2 miles, beginning in the Town of Ixonia in Jefferson County, Wisconsin and terminating near Green Bay, Wisconsin. (Compl., Ex. A.) The pipeline is to be used to transport natural gas to local utility companies for use by Wisconsin consumers, and serve as an extension of Guardian's existing pipeline that runs from Joliet, Illinois to Ixonia, Wisconsin. FERC concluded that "the ability to meet the growing demand for natural gas [in eastern Wisconsin] is currently constrained due to the lack of existing pipeline capacity." (Compl., Ex. C, at 1-5.)

FERC's decision to approve the project came after a lengthy and extensive process of soliciting input from affected members of the public. The process began in April of 2006, when Guardian held four open house meetings in Brown, Dodge and Fond du Lac Counties to provide interested residents with information about the proposed project. (Decl. of Neil Palmer ¶ 2.) Since

4

that time, printed materials about the pipeline have been repeatedly mailed and made available to affected landowners and the public. (*Id.*)

On May 19, 2006, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement* regarding the proposed pipeline.[1]  (Compl., Ex. C at 1-8.)  The Notice was sent to approximately 600 interested parties, including: federal, state, and local officials; agency representatives; conservation organizations; local libraries and newspapers; owners of property crossed by the pipeline; owners of property within 50 feet of the proposed construction of rights-of-way; and owners of property within a half-mile of proposed pipeline compressor stations. (*Id.*)  In June and August of 2006, FERC and the Wisconsin Department of Natural Resources conducted a series of six joint public meetings in Brown, Fond du Lac, Dodge, and Waukesha Counties to provide the general public with an opportunity to learn more about the proposed pipeline and to comment about environmental issues to be addressed in the Environmental Impact Statement. (Palmer Decl. ¶ 3; Compl., Ex. C at 1-8.)

On October 13, 2006, Guardian filed its formal application with FERC pursuant to Section 7(c) of the Natural Gas Act, requesting approval to construct the pipeline.  (Compl. Ex. A at 1,¶ 1.) As part of the application process, Guardian filed alignment sheets with FERC, showing the location of each property that the proposed pipeline would cross.  (Decl. of Patrick Vaughan ¶ 17, Ex. C.) The application was noticed in the *Federal Register* on October 30, 2006.  (*Id.*, Ex. C. at 1-1.)

FERC issued a draft Environmental Impact Statement for the project on April 13, 2007.  The draft was mailed to approximately 1,065 individuals and organizations.  (Compl., Ex. C at 1-9.)

---

[1]The full title of the document is: *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Guardian Expansion/Extension Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings.*

5

Issuance of the draft was followed by another round of public meetings at various locations along the pipeline route. (Palmer Decl. ¶ 5.) FERC conducted three public meetings to solicit comments on the draft. (*Id.*) In addition, Guardian conducted open house meetings and met with various town and village boards and farm organizations along the pipeline route. (*Id.*) FERC then issued its final Environmental Impact Statement for the project on October 26, 2007, and it was published in the *Federal Register* on November 6, 2007. (Compl. Ex. A at 16, ¶ 46.) FERC also mailed copies of the final Environmental Impact Statement to affected landowners, local government agencies, elected officials, newspapers, and various other interested entities and groups. (*Id.*, Ex. C. cover letter at 3.)

As issued, the FERC certificate specifically approved the route Guardian had requested in the application process. (Compl. Ex. A at 1at ¶ 2, 24 at ¶ 71(a).) Guardian formally accepted the terms of the FERC Certificate on December 28, 2007. Under the terms of the FERC certificate, Guardian must complete construction of the pipeline and have it in service for use no later than December 14, 2008 – one year from the date of issuance. (*Id.*, Ex. A-B.) Guardian claims that if it is to have any chance of meeting the December 14, 2008 deadline, it must begin construction by May 1, 2008. (Br. Supp. Mot. to Confirm Authority 14-15.)

In order to construct the pipeline, Guardian must acquire permanent and temporary easements across approximately 478 parcels of land.[2] The permanent easement grants Guardian the rights necessary to construct, inspect, maintain, and repair the pipeline on the landowner's property. In most cases, the permanent easement affects an area of land 50 feet in width – 25 feet on each side

---

[2]In addition, Guardian must acquire fee simple interests in three parcels in order to construct two meter stations and one "tap" station. The size of the parcels needed for these purposes is 3.13 acres, 2.12 acres, and 0.23 acres, respectively. (First Decl. of Thomas C. Davis ¶ 4.)

6

of the pipeline. The temporary easement grants Guardian the temporary right to utilize a portion of the landowner's property adjacent to the pipeline as a temporary workspace to allow for safe construction and preservation of topsoil moved during the installation. The temporary workspaces vary in width between 45 and 60 feet, depending upon the characteristics of the individual parcel. (First Davis Decl. ¶ 2.)

After the pipeline is installed, the landowners will retain the right to continue to use the surface of the easement for agriculture, pasturage, and other purposes that do not interfere with the safe operation of the pipeline. (*Id.* ¶ 3.) The easements prohibit landowners from constructing buildings or other structures on the easements, planting trees or shrubs on the easements, changing the ground elevation or grade of the easements, impounding water on the easement, and taking any other acts that would interfere with the safe operation of the pipeline. (*Id.*)

Of course, the exercise of the power of eminent domain that has been delegated to it requires that Guardian pay each individual over whose land the pipeline will run "just compensation" for the land that is taken. U.S. Const. amend. V. Guardian must also pay each landowner for the loss of the use of the land resulting from the project. Guardian notes that although it was able to reach voluntary agreements over compensation with the owners of the majority of the affected parcels, it was unable to reach agreement concerning the purchase of the necessary easements and fee simple interests with the owners of 190 of the tracts over which its pipeline must run. Those are the tracts owned by the Landowners that are the subject of the in rem action here. Guardian now seeks an order confirming its authority to condemn the subject properties and a preliminary injunction granting it immediate entry and possession so that it can begin the work necessary to complete the project by the December 14, 2008 deadline.

7

## II. ANALYSIS

At its core, the dispute between Guardian and the Landowners in this case is about the procedure to be used in determining the compensation that Guardian must pay for the property rights it is taking. There is no dispute over Guardian's right to build the pipeline over the Landowners' property. That issue has already been decided by FERC, and it is well established that "[t]he validity and conditions of the FERC certificate cannot be collaterally attacked in district court." *Guardian Pipeline, LLC v. 529.42 Acres*, 210 F. Supp. 2d 971, 974 (N.D. Ill. 2002). The exclusive avenue for judicial review of a FERC certificate is a petition for review filed in the United States Court of Appeals. 15 U.S.C. § 717r(b); *Willaims Natural Gas Co. v. Oklahoma City*, 890 F.2d 255, 261 (10th Cir. 1989). None of the Landowners sought such review.

Nor is there any dispute about the fact that the Landowners are entitled to "just compensation" for the property interests that are taken. The right to receive "just compensation" is not only guaranteed by the Fifth Amendment to the United States Constitution, it is also required by the statute under which Guardian seeks to proceed. 15 U.S.C. § 717f(h). *See also* Fed. R. Civ. P. 71.1((h). Under the FERC certificate, Guardian must pay each Landowner the value of the land interest it takes and, in addition, compensation for potential crop loss for a five-year period based on a formula established in the Agricultural Impact Mitigation Plan that was developed in consultation with the Wisconsin Department of Agriculture, Trade and Consumer Protection and incorporated into FERC's final environmental impact statement.[3] (Compl., Ex. C, App. E at 1.) The

---

[3]Under the crop loss formula, Landowners with farmland crossed by the pipeline are to receive 100% of the estimated total value of crop yield during the year of construction (year one), 80% in year two, 60% in year three, 40% in year four, and 20% in year five. The crop values are based upon the published average yields and prices for those crops in the relevant county. (Compl. Ex. C., App. E at 1.)

8

question over which the Landowners are concerned is how the compensation they will receive from Guardian is to be determined.

Guardian contends that in attempting to reach voluntary agreements and thereby avoid the costs and delays of condemnation proceedings, it contacted each landowner at least three times (and in most cases, many more times). Its general practice was to first contact each landowner in an effort to schedule a personal meeting to discuss an offer to purchase the easement. At the meeting, Guardian's land agent would describe the project, describe the nature of the easements Guardian was seeking to purchase, and explain the terms of Guardian's offer. Each landowner was provided a written offer to purchase at that meeting. If the landowner did not accept Guardian's first offer, Guardian's land agent contacted the owner again at a later time to reiterate Guardian's offer and, in some cases, discuss changes to that offer. Guardian states it also sent each landowner a written, final offer on December 27, 2007, immediately after Guardian notified FERC that it was accepting the terms of the FERC certificate. (First Davis Decl. Par. 6.) Guardian claims that it offered each landowner what it believes to be the fee value of the land subject to the easement, as opposed to just the value of the easement, as well as compensation for the estimated five-year crop loss. (*Id.* ¶¶ 6-8; Pl.'s Br. Supp. Mot. Confirm Auth., at 12-13.) While it was successful in reaching voluntary agreements with the majority of landowners, Guardian has now invoked the jurisdiction of this court to exercise the power of eminent domain granted it under the FERC certificate to acquire the remaining property interests it needs.

The Landowners, on the other hand, invoking the words of President Ronald Reagan in his *First Inaugural Address* that "We are a nation that has a government – not the other way around," argue that Guardian, as "a private enterprise interstate condemnor, vested with the powers of the

Federal Government," must be held to "standards of strict scrutiny in its behavior and interaction with landowners." (Dkt. 150, Def.'s Supp'l Br. Opp. Mot. Confirm at 2.) The Landowners then proceed to accuse Guardian of failing to meet this standard by using "coercive negotiation tactics" (id. at 7), acting in an "ugly and inequitable manner" (Dkt. 164, Def.'s Reply to Pl.'s Supp'l Br. Supp. Mot. Confirm at 2), making "threats, misrepresentations and inequitably low offers," (Dkt. 105, Def.'s Br. Resp. Mot. Confirm at 17), and in general acting unconscionably and in bad faith. In order to protect them from such abuse and to insure that they are treated fairly, the Landowners argue that Guardian should be required to comply with Wisconsin's law governing condemnation proceedings.

Wisconsin law, to be sure, confers significant procedural rights on an owner whose land is taken by condemnation and places significant obligations on the condemnor to insure that the owner is fully apprised of both his rights and the amount of compensation to which he might be entitled. Under Wisconsin law, the formal procedure for determining the amount to be paid begins with the condemnor making a jurisdictional offer. But before making such an offer, the condemnor must negotiate personally with the owner in an effort to reach agreement on the amount to be paid. Wis. Stat. § 32.06(2a). The condemnor must have at least one appraisal prepared after conferring with the owner and provide the owner with a full narrative appraisal upon which the jurisdictional offer is based, as well as a copy of any other appraisal the condemnor has prepared. § 32.06(2)(a), (2)(b). At the same time, the condemnor must inform the owner of his right to obtain his own appraisal by a qualified appraiser of his choice at the expense of the condemnor. § 32.06(2)(b). Before attempting to negotiate, the condemnor must provide the owner with pamphlets prepared by the State that explain his rights. § 32.06(2a). When negotiations have begun, the condemnor must

10

provide the owner with "the names of at least 10 neighboring landowners to whom offers are being made, or a list of all offerees if less than 10 owners are affected, together with a map showing all property affected by the project." *Id.* If the negotiations are unsuccessful and the jurisdictional offer is not accepted, the condemnor can then petition to have the issue determined by the county condemnation commissioners. § 32.06(8). The award of the condemnation commission can then be appealed by either party to the circuit court where the issue can be determined by a jury. §32.06(10). If the jury verdict exceeds the jurisdictional offer or the highest written offer prior to the jurisdictional offer by 15% or at least $700, the owner is awarded his "litigation expenses," which includes all costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees incurred in connection with the proceeding. § 32.28. It thus appears that if Guardian was required to comply with state law, it could conceivably be involved in 190 such proceedings culminating in up to 190 separate jury trials over six separate counties.[4]

In contrast, Rule 71.1 of the Federal Rules of Civil Procedure, which governs proceedings to condemn real or personal property in federal court, allows the condemning authority to join all of the separate pieces of property in a single action, regardless of whether they are owned by the same persons or sought for the same use. Fed. R. Civ. P. 71.1(b). Notice of the action is then served on those persons having any interest in the property to be taken. Fed. R. Civ. P. 71.1(c)(3) and (d). The Rule contains no express requirement that the condemnor meet and confer with the

---

[4]At the hearing, counsel for a number of the Landowners explained, based on his experience in such cases, the likelihood of a significant number of jury trials to establish just compensation was negligible. In most cases, he explained, the parties are able to reach agreement after only a few trials. Of course, given the costs of ligation, the resulting delay, the uncertainty of a jury verdict, and the risk of paying the landowners' litigation expenses, the condemnor may be paying for more than the fair market value of the land and actual losses sustained in order to settle the cases.

11

owner, obtain an appraisal of the property, or pay for an appraisal requested by the owner. Nor is there a right to a jury trial. If the parties are unable to agree, the issue of compensation can, at the court's discretion, be determined by a three-person commission that has the powers of a Master appointed under Fed. R. Civ. P. 53(c). Fed. R. Civ. P. 71.1(h). Finally, Rule 71.1 has no fee shifting provision that allows the owner to recover all of his expenses, including attorneys fees, from the condemnor.

Clearly, condemnation proceedings governed by Rule 71.1 have the potential to be far less costly and time consuming than those governed by Wisconsin's Chapter 32, especially for a natural gas pipeline project like Guardian's. While the Landowners contend that the federal rule deprives them of important procedural protections provided by Chapter 32, one authoritative commentator has observed that "study of [then Rule 71A's] provisions and its practical application compels the conclusion that the rule has been an effective and flexible guide to procedure in condemnation actions, that it strikes the balance fairly between the government and landowners and fully protects the important interests for both, and that criticisms of it are unjustified." Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 3041 at 186 (West 1997). The same commentator noted that prior to the adoption of the Rule, it was criticized on the ground that it made condemnation too easy for the government. *Id.* at 189. This criticism, he notes, has since vanished and was never justified as the rule has nothing to do with when the government may condemn or what the measure of damages is. *Id.* It is concerned only with the procedure for condemnation. And since it is generally "landowners, and not the government, who benefit from a speedy and clear procedure in condemnation cases," *id.* at 190, the commentator concluded that the rule represented an improvement to landowners, as well as condemnors. "Rule 71A [now, 71.1], by providing a

12

speedy and easy procedure, permits landowners to receive their compensation more promptly, while providing one uniform procedure that the government can follow throughout the country." *Id.*

What became clear from the hearing that was held on Guardian's motions, however, is that the Landowners are less concerned with the speed and efficiency of the proceeding than what they perceive as its fairness. The impression conveyed by the more than 100 Landowners that packed the court's temporary courtroom is that there is a sharp dispute between them and Guardian over whether the land over which Guardian seeks to obtain an easement for its pipeline should be valued as farmland, which is apparently its present use, or a use bearing a higher value to which it might be put at some time in the future. For many, if not most, of the Landowners, their land represents their most valuable investment upon which they are dependent not only for their livelihood now, but also for their future retirement. (Dkt. 150, Def.'s Supp'l Br. Opp. Mot. Confirm at 5.) The easement Guardian seeks to take may, in their minds, prevent or limit the future development of their land and thereby substantially reduce its potential value. Requiring Guardian to proceed under Wisconsin's chapter 32, as they see it, offers the best change of insuring that they are paid full value for the property interest taken and the resulting loss to their land.

The concerns of the Landowners are understandable. But they are not a basis for this court to reject Guardian's right to invoke this court's jurisdiction. Guardian cannot be ordered to proceed under Wisconsin law because the Landowners believe they are likely to recover larger awards under chapter 32 than they would under Rule 71.1. Recognizing as much, the Landowners, through their attorneys, have raised a number of legal arguments in support of their claim that Guardian should be ordered to comply with chapter 32 and that, in any event, it is not entitled to the relief it seeks. It is to those arguments that I now turn. But first, I must decide whether the three cases that were

13

removed from state court should be remanded.

**A. Motion to Remand and Abstain**

   **1. Federal Jurisdiction**

As noted above, the owners of three of the tracts over which the pipeline must cross commenced almost identical actions in three separate state courts. Guardian removed all three actions to this court pursuant to 28 U.S.C. § 1446, alleging federal jurisdiction under 28 U.S.C. § 1331. The State Plaintiffs have filed motions to remand their cases to state court on the ground that federal jurisdiction does not exist. Their argument is without merit.

In their state court complaints, drafted by the same law firm, the State Plaintiffs allege that Guardian had constructed a natural gas pipeline from Joliet, Illinois to Ixonia, Wisconsin during the years 2001 and 2002. (Compl. at ¶¶ 3-4, Criter v. Guardian, Case No. 08-C-29.)[5] They allege that in order to acquire the easements needed to construct the pipeline at that time, Guardian utilized Wisconsin law and the procedures set forth in Wis. Stat. ch. 32. (*Id.* at ¶ 6.) Guardian applied for the certificate of public convenience and necessity to extend its pipeline to Green Bay on or about October 13, 2006. But before FERC issued a certificate, the State Plaintiffs allege, Land Agents employed by Guardian began contacting the owners of land along the proposed pipeline extension, including the State Plaintiffs, about acquiring easements. (*Id.* at ¶¶ 10.) Although the State Plaintiffs rejected their offer, they allege that the Land Agents were successful in acquiring a number of easements from other landowners. (Id. at ¶¶ 11-12.) The State Plaintiffs further alleged that "[d]uring the course of their negotiation efforts, the Land Agents have made representations to

---

[5]The three complaints in the removed cases are virtually identical. For convenience, reference will be made only to the complaint in Criter v. Guardian, Case No. 08-C-29.

14

landowners in an effort to coerce them to sell easements to Guardian." (*Id.* at ¶ 13.) The alleged representations include: threats to change the route of the pipeline unless the owner agreed to accept the Land Agent's offer; statements that owners who objected to the proposed extension of the pipeline through a group called Landowner Negotiators, LLC, would receive only 40% of the fair market value of the easements acquired over their land; claims that Wis. Stat. ch. 32 does not apply to the easements needed for the extension; and the general suggestion that under federal law, landowners who rejected Guardian's offers would receive far less in compensation. (*Id.*)

Based upon these allegations, the State Plaintiffs asked the state courts in which they filed their actions to determine that the acquisition of all property in the State of Wisconsin by condemnation is governed by Chapter 32 of the Wisconsin Statutes and that Guardian and its Land Agents had violated chapter 32 by, inter alia, failing to negotiate in good faith, negotiating with landowners before they were lawfully entitled to do so, advising landowners that they were not required to comply with chapter 32, and failing to provide landowners with the full narrative appraisal, the informational pamphlets, and the list of ten neighboring landowners to whom they had made offers as required under Wis. Stat. § 32.06(2a). (*Id.* at ¶ 21.) The State Plaintiffs also requested injunctive relief enjoining Guardian and its agents from negotiating with landowners before FERC issued a certificate of public convenience and necessity and directing it to comply with chapter 32 of the Wisconsin Statutes in all further negotiations with landowners. (*Id.* at 5.) The State Plaintiffs now argue that their actions were improperly removed from state court and should be remanded.

Subject to exceptions not applicable here, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant

or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Moreover, "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." 28 U.S.C. § 1441(b). Federal question jurisdiction also lies "over state-law claims that implicate significant federal issues." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312 (2005). "The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Under the "artful pleading doctrine," a corollary to the well-pleaded complaint rule, "a plaintiff may not frame his action under state law and omit federal questions that are essential to recovery." *Franchise Tax Board v. Construction Laborers Vacations Trust*, 463 U.S. 1, 22 (1983). Thus, a federal court may, in some situations, look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded his suit so as to couch a federal claim in terms of state law." *Burda v. M. Ecker Co.*, 954 F.2d 434, 438 (7th Cir. 1992). Where he has, the case will be found removable. *Id.*

The complaints filed by the State Plaintiffs seek declaratory and injunctive relief. When a declaratory judgment is sought, "jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant." *GNB Battery Technologies v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995); *see also Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 935 (7th Cir. 2008). It is obvious that such an independent basis for jurisdiction exists with respect to the State Plaintiffs' claims – Guardian has in fact brought its own

16

action under the NGA, which expressly authorizes the holder of a certificate of public convenience and necessity to acquire the land and other property needed for the construction of a pipeline "by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located . . . ." 15 U.S.C. § 717f(h). The State Plaintiffs, in essence, sought to prevent Guardian from seeking federal relief by initiating their state court actions first and requesting from those courts an injunction enjoining Guardian from utilizing the more flexible procedure authorized by Rule 71.1. The State Plaintiffs asked the state courts to determine that state law, which expressly imposes specific duties on a condemnor in his negotiation with the property owner, controls over federal law, which does not. Indeed, they claimed that federal law, as they view it, requires such a result. More specifically, the State Plaintiffs alleged in their complaints that despite the representations of Guardian and its Land Agents to the contrary, "it is Plaintiffs' position that they are required to follow the mandated procedures under Chapter 32 in order to acquire the land necessary to complete construction of the Expansion because Guardian has consistently been a condemnor, consented to the jurisdiction of the Wisconsin State Court System, and, *even under federal law, is required to comply with the 'practice and procedure' of Wisconsin*." (Compl. at ¶ 22, Case No. 08-C-29) (italics added). The federal law referred to is § 7 of the NGA, which states that the practice and procedure in any action or proceeding to exercise the power granted under the NGA for construction of a natural gas pipeline "shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated." 15 U.S.C. § 717f(h). Thus, the State Plaintiffs claimed that the NGA incorporates, and mandates compliance with, the condemnation procedure of the state in which the land to be acquired is located.

17

It is clear from the foregoing that the state court actions were properly removed. By asking the state courts to declare that Guardian was not entitled to utilize the condemnation procedure authorized by federal law to exercise the power of eminent domain granted it by a federal agency, the State Plaintiffs raised a significant issue of federal law. If natural gas pipeline companies were required to comply with state condemnation procedures, federal energy policy as reflected in the FERC certificate, as well as the federal goal of providing a fair, effective, and uniform procedure for compensating landowners across whose land the pipelines must cross, would be seriously undermined. I therefore conclude that federal question jurisdiction exists and the motion to remand should be denied.

## 2. Abstention

The State Plaintiffs and other Landowners contend that the court should abstain from exercising federal jurisdiction in this matter and order Guardian to proceed on its condemnation action in state court. The abstention doctrine "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). It has no application here.

The abstention doctrine may apply when there are parallel proceedings in state and federal court. Under some circumstances, the federal court should abstain from hearing the case and "await the outcome of parallel proceedings as a matter of 'wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation.'" *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999) (*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Supreme Court has cautioned, however, that abdication of the federal court's obligation to decide cases can be justified

under the abstention doctrine "only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813 (1976).

In order to decide whether the so-called *Colorado River* abstention doctrine applies to a particular case, the court must first determine "whether the concurrent state and federal lawsuits are parallel." *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 591 (7th Cir. 2005). "Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora." *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001). If the cases are parallel, the next task is "to balance the considerations that weigh in favor of, and against, abstention, bearing in mind the exceptional nature of the measure." *Finova*, 180 F.3d at 898. The factors that must be considered include:

> 1) whether the state has assumed jurisdiction over property; 2) the inconvenience of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim.

*Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 701 (7th Cir. 1992).

Here, the federal and separate state cases are not parallel and, even if they were, consideration of the relevant factors overwhelmingly favors the exercise of federal jurisdiction. The cases are not parallel because while each involves Guardian as a party, the three state cases have different plaintiffs, are venued in different courts and concern different parcels of land. Turning to the factors the court is to consider if parallel cases were found to exist, it is apparent that the state courts have not assumed jurisdiction over the property Guardian seeks to acquire. A single federal

19

forum is far more convenient than three or potentially 190 separate cases spread over six counties so that exercising federal jurisdiction will avoid piecemeal litigation. Although the state court actions were started first, it is clear they were filed in anticipation of the federal lawsuit, and thus this factor deserves no weight. The source of governing law is federal since Guardian's power of eminent domain is delegated to it by FERC, a federal agency, pursuant to the NGA, a federal law. No one state court would have jurisdiction over the entire case; nor is it likely that state courts would be familiar with the NGA. Finally, the state court proceedings had just been commenced when they were timely removed by Guardian. As a result, there are no longer proceedings even pending in state court. It thus appears that none of the factors supports the Landowners' request that the court abstain.

In *Pennzoil Co. v. Texaco, Inc.*, the Court held that a federal district court should abstain "if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." 481 U.S. 1, 11 (1987). The Landowners argue that abstention is appropriate because Wisconsin's interest in applying its laws to its citizens is of greater importance than the federal interest in providing uniform condemnation procedures for condemnors across the states. They claim that to allow the case to proceed in federal court thus offends the comity between the state's sovereign right to protect its citizens and the federal interest. The argument proves too much. If a state's interest in applying its own condemnation procedure for its citizens constituted grounds for abstention, natural gas pipeline companies would be precluded from ever exercising the power of eminent domain granted them by FERC in the district courts of the United States, as they are explicitly authorized to do under 15 U.S.C. § 717f(h). If that were the case, Congress need not have enacted the law in the first place.

Case 1:08-cv-00028-WCG   Filed 04/11/08   Page 20 of 45   Document 171

The Landowners also claim that the high number of defendants in this case constitutes an exceptional circumstance that would place a substantial burden on one district court. The matter can be more appropriately addressed, they argue, by allowing six state circuit courts to handle the litigation. But it was just such a case that Rule 71.1 was intended to address. To require multiple courts to address the matters at issue in this case is likely to diminish rather than promote judicial efficiency, and provides no basis for depriving Guardian of its authority to pursue condemnation in federal court.

The Landowners nevertheless argue that abstention is appropriate in this case because Guardian has already consented to the jurisdiction of Wisconsin courts and has invoked Wisconsin law to obtain easements needed for its pipeline. (Def.'s Br. Supp. Remand and Abstain at 11-12.) In support of this argument, the Landowners note that for the Wisconsin portion of the first leg of the pipeline which brought it to Ixonia, Guardian elected to proceed under chapter 32 to acquire the easements needed for the project. *See Hoekstra v. Guardian Pipeline, LLC*, 2006 WI App 245, 298 Wis. 2d 165, 726 N.W.2d 648. Having previously availed itself of Wisconsin law and Wisconsin courts, the Landowners argue that Guardian should not be permitted to now jump to a federal forum.

In support of its argument, the Landowners cite *Transcontinental Gas Pipe Line Corp. v. 65.47 Acres of Land*, 778 F. Supp. 239 (E.D. Pa. 1991). In *Transcontinental*, a pipeline company seeking to condemn property pursuant to a FERC certificate initially filed a state action, but became dissatisfied with the timing of a hearing date it was assigned. The company then filed an "identical federal action" to condemn the same land pursuant to the same certificate. The district court held that "although the Natural Gas Act gives a condemnor a choice of forum, the language of the Act provides that it is an election of one or the other, not both concurrently." *Id.* at 241. Because the company had chosen the state forum, the court concluded that the federal forum could not also have

21

jurisdiction over the matter and ordered the case dismissed.

*Transcontinental* does not support the Landowners' position here. Unlike that case, Guardian has not previously commenced an identical case in state court. Guardian constructed the first phase of the pipeline, according to the complaints filed in state court, in 2001 and 2002. (Compl. at ¶ 4, Case No. 08-C-29). The condemnation proceedings for that pipeline involved a different FERC certificate, different land and different parties. The suggestion that Guardian has somehow forfeited its right to exercise its power of eminent domain over different land owned by different individuals for a different pipeline authorized by a different FERC certificate because it utilized Wisconsin law on a project that began some seven years ago finds no basis in logic or law. The Landowners' request that the court abstain from exercising jurisdiction is therefore denied. 15 U.S.C. § 717f(h).

**B. Motion to Confirm Condemnation Authority**

    **1. The Conformity Clause and Rule 71.1**

The Landowners argue that even if Guardian can bring its action in federal court, it must follow Wisconsin condemnation practice and procedure, as opposed to Rule 71.1. (Dkt. 105, Def.'s Br. Opp. Confirm at 9.) Their argument is based on the plain language of the NGA, which in pertinent part states:

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. *The practice and procedure in any*

22

> *action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated . . . .*

15 U.S.C. § 717f(h) (italics added). Far from nullifying state law, the Landowners contend on the basis of the italicized conformity clause, that the Congress expressly incorporated state law into the NGA and mandated that it be followed. Furthermore, they contend, a rule established by the Supreme Court under the Rules Enabling Act, 28 U.S.C. § 2072, "cannot nullify or repeal a federal statute." (Dkt. 105, Def.'s Br. Opp. Confirm at 10.) Finally, the Landowners contend, if Rule 71.1 nullified or repealed § 717(h), then Guardian's entire case falls because its authority to exercise powers of eminent domain are derived entirely from that section. (*Id.*)

Unfortunately for the Landowners, this argument has already been explicitly rejected by the Seventh Circuit and apparently every other court that has addressed it in recent years. Faced with the same argument in *Northern Pipeline Company v. 64.111 Acres of Land in Will County, Illinois*, the Court affirmed the district court's holding that "Rule 71A(h) [now 71.1(h)], which was adopted in 1951, supersedes § 717f(h), which was enacted in 1938 . . . ." 344 F.3d 693, 694 (7th Cir. 2003). This is not to say that a rule established by the Court can "repeal" a statute enacted by Congress. As the Court explained in *Northern Pipeline*,

> the Constitution does not give the Judicial Branch any power to repeal laws enacted by the Legislative Branch. But Congress may itself decide that procedural rules in statutes should be treated as fallbacks, to apply only when rules are silent. And it has done just this, providing in what has come to be called the supersession clause of the Rules Enabling Act that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072(b).

344 F.3d at 694. "Thus," the Court concluded, "Rule 71A(h) prevails: its nationally uniform approach conflicts with the conformity-to-state-practice approach of § 717f(h), and under § 2072(b)

23

the statutory rule 'shall be of no further force or effect'." *Id; see also East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir. 2004) ("Courts, including the district court here, agree that this state procedure requirement has been superseded by Rule 71A."); *Southern Natural Gas Co. v. Land, Cullman County*, 197 F.3d 1368, 1375 (11th Cir. 1999) ("It is clear to us that Rule 71A was promulgated to override a number of confusing federal eminent domain practice and procedure provisions, such as that of 15 U.S.C. § 717f(h), and to provide a unified and coherent set of rules and procedures to be used in deciding federal eminent domain actions.").

Although the Supreme Court has not addressed this issue in the context of the NGA, it has observed that similar conformity clauses of other federal condemnation statutes are nullified by Rule 71.1. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4 n.2 (1984) (noting that condemnation proceedings brought pursuant to 40 U.S.C. § 257 are no longer controlled by the state law conformity clause of § 257 because "[t]he adoption in 1951 of Rule 71A capped an effort to establish a uniform set of procedures governing all federal condemnation actions"); *United States v. 93.970 Acres of Land*, 360 U.S. 328, 333 n.7 (1959) (holding that "federal law was wholly applicable" to federal condemnation proceeding because the state law conformity clause of 50 U.S.C. § 171 "was clearly repealed by Rule 71A"). It thus appears that the Seventh Circuit's holding in *Northern Pipeline* is not only binding on this court, but has a solid foundation.

The Landowners nevertheless argue that under the conformity clause, Wisconsin law applies to Guardian's pre-condemnation negotiations because Rule 71.1 is silent as to pre-condemnation procedures. They note that the *Northern Border Pipeline* Court acknowledged that a procedural rule cannot repeal a statute, but that in enacting the Rules Enabling Act Congress merely decided that procedural rules contained in statutes "should be treated as fallbacks, to apply only when [the

24

Federal Rules of Civil Procedure] are silent." 344 F.3d at 694. Since Rule 71.1 is silent on the subject of pre-condemnation negotiations, they argue that § 32.06 must apply. (Dkt. 105, Def.'s Br. Opp. Confirm, at 11.)

But this argument misinterprets the Court's holding in *Nothern Border Pipeline*. The Court reasoned that although the conformity clause in § 717f(h) would apply if the Federal Rules of Civil Procedure were silent, the Rules were not silent. Rather, the Rules addressed the subject of condemnation procedure in Rule 71.1, which the Court interpreted to render the conformity clause, in its entirety, of *no* further force or effect. 344 F.3d at 694. It is thus clear that the Court did not view the conformity clause as a vehicle for incorporating state condemnation procedures as to which Rule 71.1 was silent. Under the Court's reasoning, the clause is no longer operative at all. To conclude otherwise would prevent the "nationally uniform approach" reflected in Rule 71.1 that the Court found was intended to prevail. *Id.* I thus conclude that § 717f(h) does not require Guardian to comply with pre-condemnation procedures mandated by state law, or any other state mandated procedure not otherwise required by Rule 71.1.

Finally, I note that *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192 (6th Cir. 1992), a case cited by the Landowners in support of the argument that § 717f controls over Rule 71.1, is not to the contrary. In *Columbia Gas*, the Sixth Circuit held that "although condemnation under the Natural Gas Act is a matter of federal law, § 717f(h) incorporates the law of the state in which the condemned property is located in determining the amount of compensation due." *Id.* at 1199. The Court did not hold, however, that § 717f incorporates the state law governing the procedure for condemnation. Indeed, the Court explicitly noted that in that case, the district court empaneled a three-person commission pursuant to Rule

25

71A(h) to determine the compensation due. *Id.* at 1194. Instead, *Columbia Gas* stands for the proposition that, whatever procedure is used, it is the substantive law of the state in which the property is located that provides the measure of damages. In that case, for example, the gas company sought to acquire by eminent domain an exclusive underground natural gas storage field. The issue on appeal was whether the commission had erred in relying upon the present value of the expected future net income of the planned wells to determine the compensation due, rather than upon the difference in value of the subject property before and after the condemnation. The Court concluded that under the NGA, state law provided the standard for determining compensation. Since that is not the issue here, *Columbia Gas* has no relevance.

The same is true of the two other federal cases cited by the Landowners. *See Georgia Power Co. v. Sanders*, 617 F.2d 1112 (5th Cir. 1980) (holding that law of the state where condemned property located to be adopted as federal rule in determining measure of compensation for property condemned by licensee of FERC exercising eminent domain power in federal court under authority of Federal Power Act); *Spears v. Williams Natural Gas Co.*, 932 F. Supp. 259, 260 (D. Kan. 1996) (holding that state statutory interest rate, rather than federal uniform interest rate, applied to condemnation award to landowner in action brought by landowner against natural gas pipeline under Natural Gas Act). Neither case supports the Landowners' argument that § 717f(h) requires that Guardian comply with the procedural requirements of Wis. Stat. ch. 32, as opposed to the procedure set forth in Rule 71.1.

In sum, faced with the Seventh Circuit's clear and unequivocal rejection of the argument that § 717f(h) incorporates state condemnation practice and procedure, this court has no choice but to reject the argument that the procedural requirements of Wis. Stat. chapter 32 apply in this case. I

26

therefore proceed to consider the Landowners' remaining arguments.

### 2. Good faith

The Landowners next contend that wholly aside from procedural requirements under state law, federal law also imposes upon a condemnor the obligation to engage in good faith negotiations as a precondition to exercising powers of eminent domain. They argue that the obligation to negotiate in good faith is a jurisdictional prerequisite to Guardian's right to condemn and that Guardian's failure to fulfill its obligation thus requires that its motion to confirm its authority to condemn be denied. Some Landowners additionally argue that because of its failure to negotiate in good faith, Guardian must also pay their litigation expenses. (Dkt. 105, Def.'s Br. Opp. Confirm at 16-18; Dkt. 150, Def.'s Supp'l Br. Opp. at 11-27.)

The first issue the Landowners' argument raises, of course, is whether the NGA includes the requirement that the condemnor negotiate in good faith as a prerequisite to exercising its eminent domain powers. On this issue, federal courts are divided. *See e.g. Guardian Pipeline, L.L.C. v. 529.42 Acres of Land*, 210 F. Supp. 2d 971, 973 (N.D. Ill. 2002) (recognizing the "judicial gloss that the holder must engage in good faith negotiations with the landowner before it can invoke the power of eminent domain . . . although the statutes have no such specific requirement and [the court was] unaware of any case in which condemnation has been denied or even delayed because of an alleged failure to engage in good faith negotiations."); *see also Transcontinental Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990); *Kern River Gas Transmission Co. v. Clark County*, Nev., 757 F. Supp. 1110, 1113-14 (D. Nev. 1990). Other courts, however, have reached the opposite conclusion. *See Maritimes & Northeast Pipeline, L.L.C. v. Decoulos*, 146 Fed. Appx. 495, 496 (1rst Cir. 2005) ("Absent any credible authority making good faith negotiation a

27

requirement precedent to the condemnation action [pursuant to the National Gas Act], we decline the invitation to create one in this case."); *E. Tenn. Natural Gas, LLC v. 3.62 Acres in Tazewell County*, 2006 WL 1453937, *11 (W.D. Va. 2006) ("[N]othing in the [Natural Gas] Act or Federal Rule of Civil Procedure 71A requires the condemnor to negotiate in good faith."); *Kansas Pipeline Co. v. 200 Foot by 250 Foot Piece of Land*, 210 F. Supp. 2d 1253, 1257 (D. Kan. 2002) ("The plain language of the NGA does not impose an obligation on a holder of a FERC certificate to negotiate in good faith before acquiring land by exercise of eminent domain.").

The Landowners' argument on this issue is essentially a further effort to incorporate into federal law a key component of the state procedure. Under Wisconsin law, the failure to negotiate in good faith before making a jurisdictional offer is a jurisdictional defect that renders the attempt to exercise the power of eminent domain "void and of no effect." *Warehouse II, LLC v. State Dept. of Transp.*, 2006 WI 62, ¶ 7, 291 Wis. 2d 80, 88, 715 N.W.2d 213, 217 (*quoting Herro v. Natural Resources Board*, 53 Wis. 2d 157, 171, 192 N.W.2d 104 (1971)). Such failure also entitles the property owner to litigation expenses, including attorney, expert witness, and consultant fees. *Id.* at ¶ 35, 291 Wis. 2d at 105, 715 N.W.2d at 225. But Wisconsin courts seem to define good faith as a failure to comply with the detailed procedural steps required by chapter 32:

> The procedural steps which [in other cases] have been found to be jurisdictional in condemnation proceedings all have two significant features in common. The first is that they are contained within the particular statute [that] sets forth the condemnation procedure, that is, the things [that] must be done to have and to exercise the power to acquire property by eminent domain in each particular case. The second is that the statute expressly or impliedly denies the power of the condemnor to act unless the particular step is taken, and no other statutory remedy is provided for a failure to perform the particular step. The only remedy [that] exists is to challenge the condemnation itself under §§ 32.05(5) or 32. 06(5), Wis. Stats.

*City of Racine v. Bassinger*, 163 Wis. 2d 1029, 1036-37, 473 N.W.2d 526 (Wis. App.1991).

28

I have already concluded for the reasons stated above that the NGA does not incorporate the provisions of chapter 32. Since chapter 32 does not apply to federal condemnation under Rule 71.1, Guardian cannot be punished for failing to comply with its procedural requirements. It thus follows that if there is a duty under the NGA to negotiate in good faith, it must mean something different than compliance with Wis. Stat. ch. 32. The term "good faith" could be given its more common meaning, i.e., "[i]n accordance with the standards of honesty, trust, sincerity," *Pelfresne v. Village of Williams Bay*, 965 F.2d 538, 541 (7th Cir. 1992) (*quoting Random House Dictionary* 609 (1970)). But then it becomes difficult to determine whether the obligation to exercise good faith is breached in all but the most obvious cases without an evidentiary hearing.

To be sure, some of the accusations of the Landowners, though denied by Guardian in any event, simply do not amount to bad faith. For instance, the fact that some of Guardian's land agents may have told owners that the procedural rules of Wisconsin do not apply is, as the court has now held, true, and thus does not constitute bad faith. Offering owners incentives for entering into voluntary agreements and thereby allowing Guardian to avoid the expense of litigating the issue of compensation is hardly evidence of bad faith as the Landowners suggest. Likewise, that Guardian increased its offers over time is not inappropriate, especially if, as Guardian's right-of-way manager indicates, the increases are due to new information. (Third Decl. of Thomas C. Davis, ¶¶ 5-7.) Moreover, nothing prevents Guardian from indicating to landowners that it believes they will receive less compensation through condemnation proceedings than what it is offering now, or noting the expenses associated with litigation, including attorneys fees, while trying to persuade them to enter into an agreement. The fact that Guardian's offers are based on what it believes is the full value of the land in fee simple, whereas it is only taking an easement for an underground pipeline, provides

29

a reasonable basis for such a statement. Whether that is ultimately what occurs remains to be seen. And since litigation expenses are generally not recoverable in federal condemnation proceedings, it is not unreasonable to suggest that the Landowners may want to take them into account.

The various complaints of some of the Landowners concerning Guardian's handling of reroute requests also seem to reflect more a misunderstanding of the process than bad faith on the part of Guardian. Under the NGA, the route of a pipeline is determined by FERC. *See Guardian Pipeline, L.L.C. v. 529.42 Acres of Land*, 210 F. Supp. 2d 971, 975 (N.D. Ill. 2002) ("FERC has approved the route. That route requires the granting of easements (and not very intrusive easements) across some land dedicated to public uses. Any concerns about that intrusion should have been raised before FERC."). Guardian submitted a proposed pipeline route to FERC as part of its application for a certificate of public convenience and necessity. Landowners were given notice of the proposed route, referred to as the "filed route," and provided an opportunity to voice concerns about "impacts on farmland, drain tiles, future development, land values, and routing alternatives." (FERC Cert. ¶¶ 48-49, attached as Ex. A to Compl.) A number of the Landowners did in fact make their concerns known to FERC, and they were addressed in the certificate. (Id., ¶¶ 48-51.) But the route approved by FERC in its certificate is the route for which Guardian has been authorized to exercise the power of eminent domain. Other than "minor field realignments per landowner needs and requirements, which do not affect other landowners or sensitive environmental areas such as wetlands," Guardian must request realignments in writing and submit detailed alignment maps/sheets and aerial photographs identifying the requested realignment in order to get a route change approved by FERC. (Id. at App., ¶ 5.)

Because of the time and expense required to obtain approval for route changes requiring

30

FERC approval, Guardian adopted the policy of making such requests on behalf of owners only when the owner was willing to voluntarily convey the easement needed for the reroute. (Third Davis Decl., ¶ 18.) Even if Guardian did not make the request, owners remained free to formally ask FERC to change the route on their own, as several did. (Compl., Ex. A, ¶ 48-49.) Thus, to the extent the Landowners' complaint is directed at Guardian's policy of not taking on the burden of requesting route changes requiring FERC approval where there was no voluntary agreement, it does not appear sound. Guardian had no obligation to obtain approval for changes to the FERC-approved filed route that only the owner wanted. Requesting a voluntary agreement as a condition of undertaking the process does not appear unreasonable, since the Landowner remained free to request the change himself.[6] Thus, it would not constitute bad faith negotiation.

On the other hand, allegations of conduct that may indeed constitute a failure to negotiate in good faith are strenuously denied by Guardian, thereby creating factual disputes requiring evidentiary hearings to resolve. Landowner Jane Pahl, for example, claims that "no one from Guardian had explained the easement or tried to negotiate a settlement with us" until after the action was commenced. (Decl. of Jane Pahl ¶ 5.) But Guardian disputes this allegation and has submitted the Declarations of Brad Holmes and Gary Nolden, two land agents assigned to contact Mr. and Mrs. Pahl. Their declarations, prepared with the assistance of the "contact notes" Guardian required them to keep, reflect multiple efforts over the past two years to set up a meeting with Mr. and Mrs.

---

[6]It also appears that to the extent the Landowners allege that Guardian is not in compliance with the terms of the FERC certificate regarding route alterations, that challenge must be made to FERC, not the court. *See Portland Natural Gas Transmission System v. 4.83 Acres of Land*, 26 F. Supp. 2d 332, 339 (D.N.H. 1998) (holding that a district court does not have the authority to directly enforce compliance with the pre-construction conditions within a FERC certificate, as that power rests with the FERC);15 U.S.C. § 717m(a).

Pahl to discuss the easement and compensation that would be paid. (Nolden Decl. ¶¶ 2-9; Holmes Decl. ¶¶ 4-7.) Holmes even recounts arriving at the Pahl's home for a scheduled meeting and being asked to wait outside for fifteen minutes in the rain before he was allowed in to discuss Guardian's offer. The meeting ended when the Pahls insisted on tape recording everything Holmes said, but Holmes states that he was able to give them a written offer of $15,000 for the easement before he left. (Holmes Decl. ¶¶ 5-6.)

The other declarations filed by the parties reflect similar factual disputes over what efforts Guardian has made to meet with the Landowners over the past two years and the Landowners' response or whether owners were discouraged from seeking legal advice. (Decl. of Warren Maass ¶¶ 6-9; Holmes Decl. ¶¶ 8-16; Decl. of Lana Frank ¶ 7; Third Davis Decl. ¶ 11.) Some have complained that Guardian's land agents have improperly refused to agree to a minor change in the pipeline route over their property unless the owner agreed to sign the easement for the new route or misrepresented the scope of the easement Guardian to which Guardian is entitled.[7] (Frank Decl. ¶¶ 11-12.) Various landowners also complain that Guardian's offers have been unreasonably low and failed to take into consideration recent sales of nearby comparable land. (Aff. of Thomas Mirsberger ¶¶ 7-8; Decl. of John E. Batterman ¶¶ 3-8.) As to the latter accusation, Thomas Davis, Guardian's right-of-way manager, states that Guardian had a licensed appraiser do a land sale study in 2006, using a compilation of sales data from approximately 300 properties in the areas in which

---

[7] Guardian initially was using the same form easement that it was using before FERC issued its certificate. It has since revised its proposed easement so that it conforms with what FERC ordered. (Decl. of Allen A. Arntsen ¶¶ 3-4.) Guardian has been willing to modify its easements to address concerns individual Landowners may have and that it is entitled to no greater condemnation rights than those to which it is entitled under the FERC certificate and the NGA. (Supp'l Decl. of Arnold A. Arntsen ¶ 2-4.)

32

Guardian needed to acquire easments. (Third Davis Decl. ¶¶ 1, 3.) Davis and his staff then reviewed the sales data and identified sales they believed were most comparable to the properties over which they were attempting to acquire easements and then viewed the comparables and investigated some to determine that the sales were arms-length transactions. (Id. ¶ 3.) Davis states he also made adjustments for the time of the comparable in relation to the date on which Guardian was seeking to acquire the properties. Further adjustments in Guardian's offers were made based on other sales owners brought to Guardian's attention or appraisals the owner had obtained where such information was, in Guardian's view, useful and reliable. (Id. ¶¶ 5-6.) Offers were again adjusted in the fall of 2007, when Guardian's appraiser stated there had been a rise in market value of comparable property. (Id. ¶ 7.)

The Landowners suggest that the court must resolve these factual disputes and determine whether Guardian has negotiated with each of them in good faith before Guardian's authority to condemn the portion of their land needed for its easements can be confirmed. But to do so would require the court to conduct a series of mini-trials over who said what to whom and whether Guardian had a reasonable basis for the amount it offered each Landowner. Obviously, such a requirement could delay the project indefinitely. And to what end? The Landowners have cited no case in which a court has declined to confirm a pipeline company's authority granted by a FERC certificate to acquire by eminent domain under the NGA the easements needed to construct a pipeline because the company's land agents failed to fully explain the project to an owner or because the company's initial offer was unreasonably low. In *Transcontinental*, cited by the Landowners in support of their argument that good faith negotiations are required, the court held that "a single offer to purchase the right may be sufficient to constitute good faith." 745 F. Supp. at 369. Guardian

33

has clearly established at least as much here.

Finally, the need for such a finding under the circumstances is questionable. For regardless of whether Guardian's previous dealings with the Landowners amount to "bad faith," the fact remains that the parties are not in agreement over the compensation that should be paid. It would seem to matter little whether the failure to reach agreement is due to bad faith on the part of Guardian or unreasonable expectations on the part of the Landowners. What both parties need at this point is a binding decision by a neutral third party, not an investigation into the subjective motivation of their respective positions that would only delay the proceeding and add to parties' expenses. It would be different, of course, if, as the Landowners allege, Guardian or its agents had engaged in coercive and unfair tactics, and those tactics had caused a property owner to sign an unconscionable agreement under which the compensation promised was unreasonably low. If that occurred, the property owner might be entitled to rescission or some other remedy. But none of the Landowners signed an agreement. That is why they are defendants in this action.

Based on the foregoing, I conclude that the NGA does not obligate the condemnor, **as a jurisdictional prerequisite**, to negotiate in good faith with the landowner. It is enough that the condemnor made a reasonable effort to reach agreement before the holder of a certificate of public convenience and necessity can proceed to acquire the needed easements by the exercise of the right of eminent domain. I base this conclusion on the text of the statute. "It is well established that when [a] statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (internal quotation omitted). The plain language of the Natural Gas Act does not require a showing that the holder of a FERC certificate engaged in good-faith negotiations

34

in an attempt to acquire the subject property as a prerequisite to exercising its powers of eminent domain. The addition of such a judicially created prerequisite would only complicate the procedure by adding an issue that neither lends itself to clear and certain determination, nor offers significant benefit to the fairness of the ultimate determination. *See also National R.R. Passenger Corp. v. Boston and Maine Corp.*, 503 U.S. 407, 423 (1992) (rejecting argument that § 402(d) of the Rail Passenger Services Act of 1970, 45 U.S.C. § 562(d), which authorizes Amtrak to acquire by condemnation property of other railroads needed for intercity rail passenger service when the parties are "unable to agree upon the terms of the sale" imposes an obligation to engage in "good faith . . . negotiations" before it may invoke its condemnation powers).

This is not to say, however, that the condemnor does not have a duty to act honestly and in a forthright manner toward the owners of the property he seeks to condemn. As noted above, coercive or unfair tactics will make any "voluntary" agreement voidable as to the landowner. And misrepresentations that amount to fraud not only render the agreement void, but could conceivably subject the condemnor to punitive damages. This is true of any business transaction. *See, e.g., Wickenhauser v. Lehtinen*, 2007 WI 82, ¶ 41, 302 Wis. 2d 41, 734 N.W.2d 855. But the claim that the condemnor failed to negotiate in good faith by a landowner who has not relinquished a single right as a result of the bad faith alleged is not a jurisdictional defense to a federal condemnation action under the NGA.

This is also not to say that Landowners who may be dragged into federal court by a condemnor who made no reasonable effort to reach agreement on the compensation to be paid are left with no remedy. Guardian has alleged in its complaint that it "was unable to reach voluntary agreements with the owners of the remaining parcels (the 'Landowners')". (Compl. ¶ 5.) By signing

35

its complaint, Guardian has represented to the court that the factual contentions contained in its pleading have evidentiary support and that the pleading it filed "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). Violations of Rule 11 can subject a party to monetary sanctions or an order to pay the other side's attorneys fees and expenses. *See* Fed. R. Civ. P. 11(c). Title 28 U.S.C. § 1927, which allows the court to order a party or attorney who "so multiplies the proceedings in any case unreasonably and vexatiously" to pay "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," may also be available in cases of abuse. But neither the language of the statute, nor the nature of the proceeding, supports the creation of an additional and uncertain obligation for the condemnor to satisfy. Whatever effort the NGA requires to reach agreement before exercising it power of eminent domain, I find that Guardian has clearly met its burden here.

### 3. Equal Protection

The Landowners also claim that Guardian's attempt to exercise the power of eminent domain granted it under the FERC certificate by pursuant to Rule 71.1, instead of Wis. Stat. ch. 32, constitutes a denial of their Fourteenth Amendment right to equal protection. Though it is not entirely clear, the Landowners' challenge appears directed not at the constitutionality of the NGA on its face, but rather "as applied" under the circumstances of this case. The argument is based on the fact, referred to earlier, that Guardian chose to proceed in Wisconsin state court to condemn land necessary for a previous pipeline project, as it was authorized to do by 15 U.S.C. § 717f(h). The Landowners note that this earlier project, pursuant to a separate FERC certificate, established a pipeline from Joliet, Illinois to Ixonia, Wisconsin (the "First Line"), and that the present project

would serve as an extension of this existing pipeline, beginning in the Town of Ixonia and terminating near Green Bay, Wisconsin (the "Second Line").  They allege that Guardian's choice to proceed under state law as to the earlier condemnations precludes Guardian from electing to proceed under federal law pursuant to its present FERC certificate.  Otherwise, the Landowners' argue, the owners of property condemned for the construction of the First Line will have been afforded additional protections provided for in Chapter 32 of the Wisconsin Statutes that would not be available to the owners of land subject to condemnation for the construction of the Second Line under federal law.  This, they claim, would violate their right to equal protection under the United States and Wisconsin Constitutions.

The Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.[8]  In other words, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  However, there is ordinarily no equal protection violation where "there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).  It is only if a policy interferes with a fundamental right or discriminates against a suspect class that it must withstand strict scrutiny. *See Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457-58 (1988).

---

[8] The prohibition also applies to the federal government under the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  Though Guardian is not a branch of the federal government, it is bound by the same constitutional restraints when, as here, it has been delegated to exercise exclusive powers of the government, such as the power of eminent domain. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 352 (1974) ("We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State.").

37

As an initial matter, I note that "[a] plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (internal quotation omitted). The Landowners have made no such showing here. Furthermore, they have failed to identify a relevant fundamental right or suspect class. Although the Landowners contend that they possess fundamental rights to the property at issue, they do not claim that if Guardian is allowed to proceed under federal, rather than state law, they will be deprived of their right to just compensation for their property. Indeed, "[t]here can be no contention that any landowner will be awarded constitutionally inadequate compensation if federal law controls since the federal rules satisfy the requirements of the fifth amendment." *Georgia Power Co. v. 54.20 Acres of Land*, 563 F.2d 1178, 1193 (5th Cir. 1977) (overruled in part on other grounds by *Georgia Power Co. v. Sanders*, 617 F.2d 1112, 1113 (5th Cir. 1980).[9] The true crux of the Landowners' argument is that under federal law they will be deprived of certain protections and compensation available under Wisconsin law, such as the recovery of attorneys and appraisal fees, and the right to a jury trial. The Landowners have no fundamental right to such protections. *See United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979) ("[I]ndirect costs to the property owner caused by the taking of his land are generally not part of the just compensation to which he is constitutionally entitled."); *N. Borderline Pipeline Co. v. 64.111 Acres of Land in Will County*, 344 F.3d 693, 694-95 (7th Cir. 2003) (holding that landowners did not have the right to a jury trial in a condemnation action).

---

[9] The court notes, however, that even the right to just compensation has not been deemed "fundamental" for purposes of applying strict scrutiny in an equal protection analysis. *Jackson Water Works, Inc. v. Public Utilities Com'n of State of Cal.*, 793 F.2d 1090, 1093 (9th Cir. 1986); *Panhandle Eastern Pipe Line Co. v. Madison County Drainage Bd.*, 898 F. Supp. 1302, 1314 (S.D. Ind. 1995) (holding that although the right to "just compensation" is protected by the takings clause, it is not a "fundamental right" invoking strict scrutiny for purposes of an equal protection claim).

The Landowners also claim that as members of the class of persons owning land subject to potential condemnation for the construction of the Second Line, their situation is "comparable to that of members of a suspect class," and they are "similarly situated" to those who owned land condemned for the construction of the First Line. (Br. Opp., Docket No. 150, at 7-8.) For purposes of equal protection analysis, "[a] suspect class either possesses an immutable characteristic determined solely by the accident of birth, or is one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007) (internal quotations omitted). Here, the alleged class of landowners possesses no such characteristics. The bare allegation that they are "comparable" to a suspect class does not suffice.

It thus follows that Guardian need only provide a rational basis for its decision to utilize federal condemnation procedures for this leg of its pipeline. It has clearly done so. Guardian has indicated that it will be less costly for it to maintain one action in federal court as opposed to "approximately 180 separate actions in six different county courts." (Dkt. 161, Br. Supp., Docket at 10.) The Seventh Circuit has recognized cost as a rational basis for differential treatment. *Racine Charter One, Inc. v. Racine Unified School Dist.*, 424 F.3d 677, 686 (7th Cir. 2005). Accordingly, I conclude that Guardian's choice to proceed under federal law in this case, as authorized by 15 U.S.C. § 717f(h), does not run afoul of the Landowners' constitutional right to equal protection.[10]

---

[10]In light of the additional duties that Wisconsin law places on a condemnor and the state's more cumbersome procedure, the more logical question is why Guardian elected to proceed under state law for the first phase of the pipeline. When asked this question at the hearing held on its

Case 1:08-cv-00028-WCG   Filed 04/11/08   Page 39 of 45   Document 171

Having rejected the Landowners' arguments challenging the court's jurisdiction and Guardian's right to proceed under Rule 71.1, as opposed to state law, and confirmed Guardian's right to condemn the subject property, I now turn to Guardian's motion for a preliminary injunction granting it immediate possession of the land so that it can commence construction.


**C. Motion for Immediate Possession**

Numerous courts have held that upon satisfaction of the standard for injunctive relief, authorized pipeline companies holding FERC certificates may be granted immediate possession of property to be condemned prior to a determination of just compensation therefor to permit the commencement of construction on the pipeline. *Southeast Supply Header, LLC v. 40 Acres in Forrest County, Miss.*, 2007 WL 4459092, *2 (S.D. Miss. 2007); *see e.g.*, *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) ("[W]e conclude that when a gas company initiating a condemnation action under the NGA seeks immediate possession by preliminary injunction, there are sufficient safeguards in place to protect the landowner."); *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 210 F. Supp. 2d 976, 979 (N.D. Ill. 2002)(immediate possession proper when condemnation order has been entered and preliminary injunction standards have been satisfied); *N. Border Pipeline Co. v. 64.111 Acres of Land*, 125 F. Supp. 2d 299, 301 (N.D. Ill. 2000)(same); *Humphries v. Williams Natural Gas Co.*, 48 F. Supp. 2d 1276, 1280 (D. Kan. 1999) ("[I]t is apparently well settled that the district court does have the equitable power to grant immediate entry and possession [under the NGA].").

---

motions, counsel for Guardian suggested that Guardian may have been responding to political pressure placed on several utility companies with various other matters pending before the state legislature. At the time, Guardian was owned by these utility companies.

The Landowners claim that Guardian is not entitled to such equitable relief, as it comes before the court with "unclean hands," having failed to engage in good faith negotiations for the acquisition of the property interests at issue. The court has already addressed the issue of good faith negotiations, and finds the Landowners' arguments to this effect contain no basis for denial of the equitable relief requested. Nonetheless, because the right to immediate possession of the subject property here would be in the nature of a preliminary injunction, *See Northern Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 471 (7th Cir. 1998), Guardian is entitled to such relief only if (1) it has no adequate remedy at law or will suffer irreparable harm if the injunction does not issue; (2) it has some likelihood of success on the merits; (3) the balance of harms is in its favor; and (4) the public interest favors the injunction. *Northern Border Pipeline Co. v. 64.111 Acres of Land*, 125 F. Supp. 2d 299, 301 (N.D. Ill. 2000) (citing *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-88 (7th Cir. 1984)).

Guardian easily satisfies these standards in the present case. As the court has indicated, Guardian's right to condemn the subject property has been clearly established and its motion to confirm its authority to condemn will be granted, entitling it to possession of the property.[11] Indeed, the FERC Certificate is the conclusive answer to most of the objections the Landowners have raised. It incorporates the extensive specifications and requirements of the Final Environmental Impact Statement issued in October 2007. The result is that FERC has determined public convenience and

---

[11] Accordingly, the circumstances of this case are distinguishable from those in *Northern Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 471 (7th Cir. 1998), where the Seventh Circuit held that denial of an order for immediate possession was appropriate where the plaintiff failed to seek an order determining that it had the right to condemn. *Id.* at 472. Here, the court has determined that Guardian is entitled to condemn the defendant parcels of land for the purposes of constructing its pipeline.

41

necessity; has determined the route (subject to possibly minor adjustments because of specific circumstances); and has determined pipe size, depth of cover, topsoil segregation procedures, size and location of easements and a host of other matters. FERC has also made it clear that it will monitor the construction and will enforce all requirements. Landowners who believe that Guardian is not in compliance with any requirement may complain directly to FERC. But the only issue before this court will be the amount of compensation Guardian must pay. I thus conclude that none of the objections warrant denial of Guardian's motion seeking confirmation of its right to condemn the subject property. As in *Northern Border Pipeline*, "it is virtually certain that plaintiff will succeed on the merits." *Id*. This is far greater than "some likelihood."

As to the remaining elements, Guardian is under a FERC-imposed deadline to complete construction of the pipeline and have it in use by December 14, 2008, so that it is available for the 2008-09 winter heating season. Even under ideal conditions, assuming that Guardian is granted access to all of the properties, it will take at least five months to complete construction. (Vaughn Decl. ¶ 12.) Given Wisconsin's relatively short construction season, any significant delays could require work to continue on into the winter when the cost of construction will increase and the pace slow because of cold weather, snow and ice. (Id. ¶ 13.) Moreover, the standard industry practice for pipeline construction requires that the work proceed sequentially and continuously. It is not economically feasible to skip over properties scattered at various locations along the route and then come back to them at a later time. To do so would require Guardian to incur hundreds of thousands of dollars of expenses to move the large amount of material, heavy equipment, and personnel from property to property as they become available. (Id. ¶ 14-16.) None of these additional expenses could be recouped by Guardian.

42

Based upon these findings, I conclude that Guardian will suffer irreparable harm if it is not granted immediate possession of the land needed to construct the pipeline and that there is no adequate remedy at law. *See Guardian Pipeline*, 210 F. Supp. 2d at 979 (finding on similar facts "it is clear that plaintiff will suffer irreparable harm if it cannot proceed"); *Tennessee Pipeline Co. v. New England Power, C.T.L., Inc.*, 6 F. Supp. 2d 102, 104 (D. Mass. 1998) ("Tennessee has adequately established that waiting any longer to occupy the G.E. site could well preclude it from meeting the FERC-imposed December deadline for completion of construction.").

Granting Guardian's motion, on the other hand, and allowing immediate possession of the land needed to construct the pipeline will not appreciably harm the interests of the Landowners. FERC has already determined that the pipeline is necessary, and Guardian will compensate them for easements it takes and any resulting losses, including crop loss, they suffer as soon as the amount of compensation owed is determined. To the extent they have concerns over Guardian's ability to pay for losses suffered as a result of Guardian's immediate entry, Guardian will be ordered to purchase a performance bond as security. I thus conclude that the balance of harms favors granting the relief Guardian seeks.

Finally, the public interest also favors granting immediate possession. Denying Guardian's motion would also operate against the public interest, potentially limiting the natural gas available to citizens of the region in which the pipeline is to run, and/or contributing to already high natural gas prices. The "need for natural gas supply" is a "substantial public interest." *East Tennessee Natural Gas Co.*, 361 F.3d at 826. The FERC's issuance of a certificate is evidence that it has, pursuant to its authority, found this project to be in the public interest, and "to permit [the pipeline company] to begin construction of the Project prior to the determination of just compensation

43

furthers the public interest in that it will aid in ensuring that the FERC-approved Project will not be delayed." *Southeast Supply Header, LLC*, 2007 WL 4459092, *4 (S.D. Miss. 2007). I therefore conclude that Guardian has made the showing required to warrant the relief it seeks. It's motion for a preliminary injunction granting it immediate possession will be granted.

Guardian indicates it is willing to post a condemnation bond in the amount of $4,306,060 as security for the order granting it immediate possession of the land. The evidence offered in support of this figure establishes that it represents the estimated fee value of all the acreage to be encumbered by permanent easements, and 20% of the estimated fee value of the acreage to be used as temporary work space during the construction of the pipeline. (Third Davis Decl. ¶¶ 22-25.) The Landowners have offered not evidence to the contrary, and I find the amount reasonable. *See Guardian Pipeline, L.L.C.*, 210 F. Supp. 2d at 979 (noting with respect to the bond to be posted, "it seems apparent that easement values reflecting all damages should not exceed or even approach fee values."). Guardian will therefore be ordered to post a bond in that amount prior to entering upon the subject properties. If the Landowners are at some point in the future able to demonstrate that this amount is inadequate, they may bring a motion to increase it.

### III. Conclusion

For the reasons set forth above, the State Plaintiffs' motion to remand their cases to state court is denied, as is the motion to abstain from exercising jurisdiction in this matter. Guardian's motion to confirm its authority to condemn the defendant parcels is granted, as is its request for a preliminary injunction granting immediate possession of that property. Exhibit D to the recently filed Second Amended Complaint sets forth the legal descriptions and plat maps of the proposed

44

easements.[12]  Those legal descriptions and plat maps easily satisfy the federal requirement that a

condemnation complaint include a description for the property sufficient for its identification and are

incorporated herein by reference.  The precise form and conditions of the permanent easement to be

taken by Guardian as to each tract, as authorized by FERC, will be determined by the court in due

course unless the parties otherwise agree.  The court orders that the plaintiff post a bond in the

amount of $4,306,060 with the Clerk of Court before entering upon the lands of any of the

defendants as security for any damage defendants may suffer from the plaintiff's early possession of

their land and for awards of just compensation that will be made in this case.

**SO ORDERED** this 11th day of April, 2008.


      /s William C. Griesbach
      William C. Griesbach
      United States District Judge

---

[12] Fed. R. Civ. P. 71.1(f) permits unlimited amendments of complaints without leave of the court before any trial on condemnation.  Guardian filed its Second Amended Complaint on April 10, 2008.  The new complaint amends the easement descriptions and associated property maps for several tracts to reflect re-routes of the pipeline done at the request of the affected landowners.  It also amends the easement description and map for Tract 415 (Darrell and Jane Pahl) to correct an inadvertent error.  The amendment slightly alters the route of the easement and reduces the size of the taking by .02 acre.  Temporary workspace easements have also been added, as has an additional party, Holsum, Inc., as the owner of property that has been added as the result of the realignment  of the pipeline route that was approved by FERC on March 31, 2008.  Absent their consent, this decision and order shall not be effective as to any of the parties directly affected by the amendment until April 20, 2008, so that they have an opportunity to raise any objection not already addressed by the court.

45