UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GUARDIAN PIPELINE, L.L.C., a Delaware
limited liability company,

          Plaintiff,

    v.                                      Case No. 08-C-0028

295.49 ACRES OF LAND, more or less,
in Brown Co., Calumet Co., Dodge Co.,
Fond du Lac Co., Jefferson Co., and
Outagamie Co., WI, et al.,

          Defendants.

## DECISION AND ORDER

On January 20, 2010, the Federal Condemnation Commission of the Eastern District of Wisconsin, Green Bay Division ("Commission") awarded $107,100 to Jack and Linda Richeson ("Landowner") in compensation for the partial taking of a permanent easement by Guardian Pipeline, L.L.C. ("Guardian"). Landowner asks this Court to adopt the Commission Report while Guardian contends that the proper amount of compensation is $5,638.00. On August 17, 2010 this Court held a hearing and both parties argued their respective positions. For the reasons set forth below, this Court concludes that $28,796.32 is fair and just compensation for the partial taking of the permanent easement on the Richeson property.

## BACKGROUND

The 43 acre Property at issue is located in the Village of Wrightstown in Brown County. (Guardian Brief, Dkt. 548 at 2.) Approximately 7.5 acres of the Property contains a large home, a guest house, a 1-acre landscaped pond and landscaped grounds. (*Id.*) The remainder of the property

is vacant land and woods. The property has an estate feel; the 5,883 square foot residence has 10 rooms, four bedrooms, and three and a half baths. The Property is of custom grade construction with granite counter tops, a spa like master bedroom, multiple fireplaces, an art gallery, and a second kitchen for entertaining. The home has an interior in-ground pool. A 1,000 square foot guest residence is located north of the house. (Landowner Br., Dkt. 558 at 2.) The Property also features a long driveway that is carefully landscaped with trees and coach lights. The property owners, Jack and Linda Richeson, also own an art supply company and the couple uses their home to hold art workshops, entertain clients, and showcase artwork. (*Id.* at 7.) The Commission concluded that "the total value of the property as a whole, including improvements, before taking is $1,115,000." (Commission Report, Dkt. 522 at 2.)

In late 2007 and early 2008 Guardian buried a pipeline through the Richeson property as part of a 119-mile natural gas pipeline project. (Guardian Appraisal at 16-18.) The pipeline is between 20 and 30 inches in diameter and is buried 4 to 6 feet beneath the surface. (*Id.*) The pipeline is buried approximately 300 feet from the home, cutting beneath the Landowner's driveway. (Dkt. 558 at 2.) Guardian's permanent easement is 50 feet wide, with approximately 25 feet on either side of the pipeline. The total size of the permanent easement is 1.48 acres. (*Id.*) The Landowner hired a contractor to relocate 14 trees on the property so they would not be jeopardized by the installation of the pipeline. (*Id.* at 7.) Guardian has already paid the Landowner for repairs to the driveway and associated landscaping costs.

**LEGAL STANDARD**

This Court appointed a Commission to determine the just compensation due the owners of land over which Guardian Pipeline, L.L.C., has constructed a natural gas pipeline. (Dkt. 342.) This

Court instructed the Commission to follow Wisconsin Jury Instruction – Civil 8101, which directs the finder of fact to first determine the fair market value of the entire property immediately before the taking, and then determine the fair market value immediately afterwards. (Dkt. 343.) The Commission was directed to consider the use to which the entire property was put by the owner, or any other use to which it was reasonably adaptable and to base its determination on the most advantageous use or highest and best use shown to exist, either on date of evaluation or in the reasonably foreseeable near future after date of evaluation. (*Id.*) Under Wisconsin law the "highest and best use, or most advantageous use, of the entire property is the use to which the entire property could legally, physically, and economically be put on (date of evaluation) or in the reasonably foreseeable future after (date of evaluation). WIS JI-CIVIL 8101 Eminent Domain: Fair Market Value (Partial Taking).

The Condemnation Commission is a form of Special Master and its reports are reviewed under the standard set out in Federal Rule of Civil Procedure 53. *See* Fed. R. Civ. P. 71.1(h)(2)(D). This Court applies a de novo standard of review to the objected to findings of fact. Fed. R. Civ. P. 53(f)(3). The Landowner bears the burden of proof on the issue of just compensation. *See U.S. v. 4.0 Acres of Land,* 175 F.3d 1133, 1140 (9th Cir. 1999) (citing *US ex rel. TVA v. Powelson,* 319 U.S. 266, 273 (1943)).

## ANALYSIS

This Court first addresses an uncontested issue. Neither party disputes the Commission's finding that the value of the temporary taking for work space should be compensated at $600. (Commission Report, Dkt. 522 at 2.) Therefore the $600 figure is adopted by this Court.

Two issues are presented to this Court. First, whether the preponderance of the evidence supports the Commission's finding that the entire Richeson Property suffered a $106,500.00 loss in value caused by the pipeline easement. Second, if the Commission Report is not supported by the preponderance of the evidence, the proper amount of just compensation for Guardian's taking of the permanent easement. For the reasons stated herein, this Court concludes that the Commission's conclusory report is not supported by the preponderance of the evidence and that the proper amount of just compensation is $28,796.32.

The Commission heard testimony from two appraisers who gave markedly divergent approximations of the Property's devaluation. Guardian's appraiser, Scott MacWilliams, concluded that the proper devaluation of the Property is $5,038. (Guardian Brief, Dkt. 548 at 17.) Art Sullivan, the Landowner's appraiser, reached a very different devaluation figure: $143,000. (Landowner Br., Dkt. 558 at 3.) The Commission found devaluation of $106,500 but specifically noted that this value does "not reflect any compromise between the figures presented but" is "the result of a careful study and analysis of the evidence presented, giving it such weight as it deserves. (Commission Report, Dkt. 522 at 4.)

In its de novo review this Court considers the conclusions, reports, and testimony of both Appraiser MacWilliams and Appraiser Sullivan as well as the testimony and evidence presented by the Richesons. This Court first addresses the loss in value of the 1.48 acres directly affected by the pipeline easement. Second, the Court analyzes the loss in value of the remaining 41.899 acres and improvements.

**A) Loss of Value of 1.48 Acres Directly Affected by Permanent Easement**

The parties agree that the portion of the 43 acre estate directly affected by the easement--namely the 1.48 acres under which the natural gas pipeline is buried--suffered a significantly higher

loss of value than the remaining 41.899 acres. The dueling appraisals suggest that the loss of value of the 1.48 acres is between 50% and 100%.

Appraiser Sullivan opines that the 1.48 acres of the permanent easement are a "100 percent loss of value." (Tr. at 95:14-96:4, 141:11-15.) His testimony before the Commission, however, contradicted that point because he conceded that the permanent easement area still retains some financial value for the Landowner. (Tr. at 144:16-22.) Guardian's appraiser, in contrast, concluded that the permanent easement area suffered a 50% loss of value. (Tr. 200.) In comparing both appraisals this Court notes that the Landowner does not lose all rights in the permanent easement area. Guardian's appraiser fairly stated that the Landowner loses certain specific rights with respect to the easement area including the right to build over the pipeline, to fill or excavate over the pipeline, or to landscape over the pipeline. (Guardian Appraisal at 47.) The 1.48 acre parcel is not completely devalued, however, because the Landowner retains the right to farm the property, to use the land, and to sell the land to others. (*Id.*) In fact the Landowner can sell additional easements over the same property, a point Appraiser Sullivan agreed with. (Tr. 141:11-143:23.) In sum, a 100% loss in value is not supported by the preponderance of the evidence. This Court holds that a 50% loss of value of the 1.48 acres is supported by the preponderance of the evidence.

The land value per acre is also disputed. Appraiser Sullivan concludes the land is worth $8,300 per acre while Appraiser MacWilliams values it at $6,800 per acre. (Richeson Appraisal at 43; Guardian Appraisal at 2.) Appraiser Sullivan reviewed four comparable land sales ranging in value from $6,800 an acre to $10,833 an acre and opined that the Landowner's acreage falls in the middle of that range. (Richeson Appraisal at 40-43.) Appraiser MacWilliams analyzed six comparable land sales with values between $4,900 and $6,700 an acre. This Court concludes that

5

the Landowner has met its burden of proof on the value per acre issue and that $8,300 per acre is supported by the preponderance of the evidence.

In sum, this Court holds that a 50% reduction of the 1.48 acres directly affected by the permanent easement is appropriate. Given a value per acre of $8,300, the fair and just compensation for the loss of value of the 1.48 acre permanent easement is $6,142.

**B) Loss of Value of Remaining 41.899 Acres and Improvements**

This Court concludes that the entire Property is at least marginally affected by the presence of the natural gas pipeline easement. While Guardian argues that the devaluation should only relate to the 1.48 acre area directly affected by the permanent easement, not the entire 43 acre estate (Guardian Br., Dkt. 548 at 14), the Commission found that the "placement of a pipeline which bisects the property and lies within approximately 300 feet of the residence, causes a stigma effect on the property as a whole used for estate purposes." (Commission Report, Dkt. 522 at 4.) The appraiser for Guardian agreed that the highest and best use of the Property is the existing rural residential use. (Guardian Br., Dkt. 548 at 6.) The Commission noted that given "the flavor of the property and the configuration of the entire parcel, we conclude that this is a very unique single family parcel." (Commission Report, Dkt. 522 at 4.) Since the property is best used as a single estate, which cannot be appropriately divided into smaller parcels, it follows that the permanent easement affects the entire estate, not just the 1.48 acres that are "directly" affected by the easement. Because the Property's highest and best use is as a single 43 acre estate, the pipeline easement necessarily affects the overall marketability and value of the entire parcel. While the majority of the 43 acre estate consists of wooded area, a pond, and farmland, the fact remains that a very large and expensive home sits squarely in the middle of the property. It is improper to conclude that the

6

easement only affects the field, driveway, and trees that the pipeline runs under where, in reality, the estate would be bought and sold as a complete single residential parcel.

The next logical question is how much, if at all, the pipeline easement lowers the value of the remaining 41.899 acres and improvements. Appraiser Sullivan concluded that the portion of the subject property outside of the permanent easement area would suffer "stigma" damages of 12%. (Richeson Appraisal at 35.) Appraiser MacWilliams concluded that the pipeline easement caused no loss of value to the remaining acreage and buildings. (Guardian Appraisal at 1.)

This Court is not persuaded by Appraiser Sullivan's analysis. Sullivan relies heavily on lot sales from the Pleasant Valley subdivision in Washington County. (Richeson Appraisal at 34-36.) Sullivan found that lots in the subdivision encumbered by a 100-foot wide gas pipeline easement sold for less than unencumbered lots. (*Id.*) The Pleasant Valley lot sales are distinguishable from the Richeson property for several reasons. First, the 100-foot wide easement significantly restricted where Pleasant Valley lot purchasers could locate their homes on the lots they purchased. In contrast, the Richeson home is already built and future subdivision is not consistent with the highest and best use of the estate. Second, by comparing bare lots to a finished home, Sullivan compares apples to oranges. Many of the Pleasant Valley lots were developed with expensive homes in the 1990's and resold. His analysis does not show that subsequent Pleasant Valley buyers paid less for encumbered lots with finished homes than for unencumbered lots with finished homes. Such an analysis may have been persuasive. An 11% reduction of value for bare lots in Pleasant Value is understandable given the building limitations cause by the easement. It does not follow, however, that such a reduction of value should be applied to the finished Richeson estate. There the easement is only 50 feet wide–half the 100 feet easement in Pleasant Valley–and estate has a complete home

7

rather than just an unimproved lot. Appraiser Sullivan's analysis is further called into question by his conclusion that the 1.48 acres directly affected by a permanent pipeline easement suffered a 100% loss of value. As addressed above, such a dramatic reduction in value simply does not comport with common sense. The Richesons' use and enjoyment of the now encumbered 1.48 acres is identical to their use and enjoyment of the same previously unencumbered 1.48 acres. It appears that Appraiser Sullivan selectively applied the 100% reduction in value analysis to the Richeson property; he conceded that he did not analyze the Pleasant Valley in that manner. (Tr. at 153:3-154:12.)

Appraiser MacWilliams based his opinion that the pipeline easement causes no reduction in value on the remaining 41.899 acres and improvements, in part, on a comprehensive study of more than 10,000 property sales along a natural gas transmission pipeline in Oregon. (Guardian Appraisal at 36 & Appendix, Eric Fruits, Ph.D., *Natural Gas Pipelines and Residential Property Values: Evidence from Clackamas and Washington Counties*.) The Oregon pipeline, 36 inches in diameter and buried 5 feet underground, is similar to the Wisconsin pipeline. (*Id.*) The study concludes that the presence of the pipeline had no statistically significant impact on the sales price of properties within one mile of the pipeline. (*Id.* at 10.) The Oregon study, completed in 2008, is contemporaneous with the installation of the Guardian pipeline in Wisconsin. The Landowner attempts to distinguish the Oregon study because it relates to properties located next to a pipeline rather than properties directly encumbered by a pipeline easements. This distinction does not strip the Oregon study of all relevance. Any "stigma" effect of a gas pipeline should be similar whether the pipeline runs through one's property or along the edge of one's property. Many homes have buried natural gas lines running into the home. There is no evidence on this record that the presence

8

of such residential gas lines causes a stigma. While the natural gas line running through the Richeson property is significantly larger (20 to 30 inches) than a typical residential line (an inch or less), the fact remains that both lines are completely buried and hidden from view.

Evidence on this record supports the conclusion that potential buyers and sellers do not expect a lower price on account of a natural gas pipeline easement. Appraiser MacWilliams cites at least seven examples where Wisconsin buyers and sellers of rural land stated that a permanent natural gas pipeline did not influence their purchase or sales price. (Guardian Appraisal at 37-42.) Landowner takes issue with these conclusions because the subject parcel is not bare rural land, but rather is used as an estate/residence. During oral argument on August 17, 2010 counsel for Landowner argued that Jack and Linda Richesons' testimony shows a potential buyer's reaction to a gas pipeline under the property. Linda Richeson testified before the Commission that "I wouldn't want to buy a property if I had a family knowing that I had a pipeline going under it...I think I would have asked a few questions...Will it collapse in 10 years? 20 years?" (Landowner Brf., Dkt. 558 at 10.) Jack Richeson explained that the easement affected the security of the property because Guardian employees can come and go unannounced to maintain the pipeline easement. (*Id.* at 9.) While the Richesons' concerns are legitimate, they are hardly uninterested parties. This Court must consider how the natural gas pipeline easement would affect knowledgeable buyers and sellers, standing at arms-length, in the open market. On that point the Richesons' testimony is persuasive but not controlling.

Certainly it is possible that potential buyers of a residential estate may consider the presence of a permanent natural gas pipeline but there is no persuasive evidence on this record that such a pipeline easement causes a 12% reduction in value. A buried pipeline is not visible. Despite the

9

presence of the pipeline any potential buyers of the subject land would certainly enjoy the same natural beauty of the estate as the current owners. The pipeline does not change the unique estate like feel of the property; it still has trees, a pond, open fields, and a custom grade home. While the presence of the pipeline may bother the current owners, there is no evidence that potential buyers would be concerned about a pipeline buried five or six feet underground, much less even notice its presence. Jack Richeson actually testified that "I don't think it looks that bad." (Tr. at 37:23-38:7.) Any argument about stigma caused by safety concerns is unsupported by this record. Landowner has presented no evidence of natural gas pipeline disasters. This Court has considered the "Pipeline Safety" pamphlet mailed to the Landowner and submitted at oral argument but notes that the pamphlet states "Federal governmental statistics show that pipelines have a safety record unequaled by any other mode of transportation." (August 17, 2010 Oral Argument, Ex.1 at 2.) The current owners may have subjective safety concerns, but such concerns are not borne out by objective evidence.

Counsel for landowner also argued that the pool of potential buyers who could afford the Richeson property is very limited. This may be true but there is no direct evidence, on this record, to support an argument that potential buyers of a $1 million estate would think less of a property encumbered with a buried natural gas pipeline. Landowner could have, but did not, present testimony from local real estate agents in support of such an argument. Perhaps a real estate agent would testify that there are only a handful of potential buyers in the $1 million price range in any given year and could clarify what sentiments such buyers express about underground easements. In the absence of such testimony this Court is left with common sense and speculation. The Landowner has not established a loss of value of 12% on this record. The Landowner bears the

burden of proof on the issue of loss of value and this Court is only persuaded that there is a minor loss of value to the entire estate. Accordingly this Court holds that the remaining 41.899 acres and buildings are reduced in value by 2%. The Commission's conclusion that the total value of the property as a whole, including improvements, before taking is $1,115,000 is supported by the preponderance of the evidence. (Commission Report, Dkt. 522 at 2.) Removing 1.48 acres at $8,300 per acre from this total value reduces this pre-taking value by $12,284 to $1,102,716. Thus, with a 2% loss of value, the remaining 41.899 acres and the improvements are reduced by $22,054.32.

## CONCLUSION

This Court concludes that Commission's conclusory finding that the entire Richeson Property suffered a $106,500.00 loss of value caused by the pipeline easement is not supported by the preponderance of the evidence. The Landowner has failed to establish that the pipeline easement reduced the value of the entire parcel by 12%, or even 9%.

This Court has carefully considered the appraisals, the unique nature of the property, the results of the Oregon study, the Richesons' testimony, and arguments by both counsel. The Landowner has established a $6,142.00 loss of value of the 1.48 acres directly encumbered by the easement. The Landowner has also presented sufficient evidence to convince this Court that the remaining 41.899 acres and improvements suffered a 2% loss of value in the amount of $22,054.32. Finally, an additional $600 will be included for the uncontested value of the temporary taking for work space.

**THEREFORE IT IS ORDERED** that Jack and Linda Richesons' request that this Court adopt the Condemnation Commission is **DENIED.**

**IT IS FURTHER ORDERED** that Guardian pay $28,796.32 to Jack and Linda Richeson, in compensation for Guardian's partial taking of a permanent easement.

Dated this   24th   day of August, 2010.

                                                                              s/ William C. Griesbach
                                                                              William C. Griesbach
                                                                              United States District Judge